AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| The Commercial Building Located at 566 Holyoke Street, Ludlow, MA | ) ) ) |

Case No. 16 Mj 3193 ( KAR )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

The Commercial Building Located at 566 Holyoke Street, Ludlow, MA - Described in Attachment A to accompanying affidavit of ATF Special Agent Anthony J. Ventetuolo

located in the _____ District of _____ Massachusetts _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attchment B to accompanying affidavit of ATF Special Agent Anthony J. Ventetuolo

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 922(b)(5); 922(m); 922 (e); 923(i) and 924(a)(1)(A) | |

The application is based on these facts:

See accompanying affidavit of ATF Special Agent Anthony J. Ventetuolo

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

ATF Special Agent Anthony J. Ventetuolo
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____10/14/2016_____

_____
*Judge's signature*

City and state:  Springfield, MA

Katherine A. Robertson, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Anthony J. Ventetuolo, being duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been so employed since May 2015. I was employed as a Police Officer in the City of Virginia Beach, Virginia, from 2002 until 2012. I was also employed by the United States Army Special Operations Command and completed three overseas deployments in support of the Global War on Terror as a Training Instructor in direct support of a Special Operations military unit.

2.     I graduated from the City of Virginia Beach Basic Police Recruit Academy in 2002, and attended other training in narcotics and firearms investigations during my tenure as a Police Officer. In 2015, I graduated from the Federal Law Enforcement Training Center Criminal Investigator Training Program, a training program that focuses on federal criminal investigations. I am also a graduate of the ATF Special Agent Basic Training Program, a training program that included courses on the use of confidential informants, search warrant preparation, surveillance techniques and other aspects of criminal investigations within the jurisdiction of ATF. I graduated from James Madison University, in Harrisonburg, Virginia, with Bachelor of Science degrees in political science and public administration, and earned a Master's degree in criminal justice from Troy University.

3.     In my capacity as a Special Agent and Police Officer, I have investigated violations of local, state and federal criminal statutes, and made arrests, prepared search and arrest warrant affidavits and seized currency, firearms, narcotics and other evidence pursuant to criminal

1

investigations. I have experience and training in firearm trafficking cases that relied on the utilization of informants and cooperating witnesses to investigate firearms trafficking. Through experience and training and through witness, suspect, and informant interviews I have learned about the manner in which Federal Firearms Licensees ("FFLs"), individuals and organizations distribute firearms illegally.

4.      This affidavit is made in support of an application for a warrant to search the commercial property located at 566 Holyoke St, Ludlow, Massachusetts, used by Remsport MFG LLC,1 described further in Attachment A (the "Subject Premises"), for evidence, described further in Attachment B, concerning violations of the following: (a) Title 18, United States Code, Section 922(b)(5) (Failing to keep required records) (b) Title 18, United States Code, Section 922(m) (Federal Firearms Licensee omitting information from or falsifying records); (c) Title 18, United States Code, Section 922(e) (shipment in interstate or foreign commerce, to persons other than licensed importers, manufacturers, dealers, or collectors, any package in which there is any firearm without written notice to the carrier); (d) Title 18, United States Code, Section 923(i) (licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon); and (e) Title 18 United States Code, Section 924(a)(1)(A) (knowingly making a false statement of information required to be kept in the licensee's records) (collectively referred to as the "Subject Offenses").

5.      The statements in this affidavit are based on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because

---

1 According to information obtained by ATF Industry Operations, Remsport MFG LLC is a FFL and Class II manufacturer located in Ludlow, MA; Ronald J. Chiasson and Ronald S. Chiasson are the Responsible Persons for this FFL. Ronald S. Chiasson conducts firearms related business under business names Remsport MFG LLC, RCS Diesel, TR Enabling, and RMI Inc, all under the FFL number 6-04-00915.

2

this affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a search warrant, I have not included every fact known to me or to the government concerning this investigation.  Instead, I have set forth facts that I believe are sufficient to establish probable cause to believe that there is evidence, instrumentalities, and fruits, described further in Attachment B, concerning violations of the Subject Offenses located at the Subject Premises.

### Background Information on Firearms Trafficking

6.      Based on my training, education, experience, and discussions with other law enforcement agents, I know the following:

a.      FFLs who engage in unlawful transactions, sales and transfers of firearms often keep records, documents and property which constitutes evidence, at their place of business. Additionally, FFLs who are engaged in unlawful firearms trafficking of firearms, which do not have the proper manufacturers markings and serial numbers, will not have such records, as specified in the GCA, which is in violation of federal laws and regulations.

b.      Firearms traffickers often keep records of smuggling transactions and activities within their businesses, or keep them readily accessible in offices or storage areas, and conceal such items from law enforcement authorities.

c.      Although firearms may be transported or exported, documentary and shipping records often remain available and accessible.

d.      Transaction records, customer lists, financial statements and other evidence of financial transactions relating to obtaining, transferring, secreting or spending various sums of money made from engaging in the business of selling firearms are often retained at a person's business.

3

e.      FFLs engage in interstate and foreign travel in furtherance of their illicit activities.  Evidence of such travel is often maintained in the form of airline ticket receipts, credit card receipts, hotel receipts, travel agency vouchers, records of long distance telephone calls and other items reflecting domestic and foreign travel.

f.      FFLs and their associates use cellular telephones and computers to coordinate their activities. Specifically, computers are utilized to generate invoices, packing slips, shipping labels, email correspondence, and to file on-line electronic forms.  FFLs often use computers for logging the acquisition and disposition of firearms and firearm parts.  FFLs are required by ATF to regularly "back-up" their electronic acquisition/disposition records.

### The Gun Control Act and the Federal Regulation of Firearms

a.      The Amended Gun Control Act of 1968 defines a firearm as "any weapon (including a starter gun) which will or is designed to or may be readily converted to expel a projectile by the action of an explosive . . . [and] . . . the frame or receiver of any such weapon" (*see* 18 U.S.C. § 921(a)(3)).

b.      As stated in 27 C.F.R. § 478.123(a), Federal Firearms Manufacturers are required to keep a record of the type, model, caliber or gauge, and serial number of each complete firearm manufactured or acquired, and the date such manufacture or other acquisition was made. The information should be recorded not later than the seventh day following the date such manufacture or other acquisition was made.

c.      Under 27 C.F.R. § 478.123(b), Federal Firearms Manufacturers are required to keep a record of the quantity, type, model, manufacturer, caliber or gauge, and serial number of the firearms so transferred, the name and license number of the licensee to whom the firearms were

4

transferred, and the date of the transaction.  The information should be recorded not later than the seventh day following the date of the transaction.

d.      Under 27 C.F.R. § 478.123(d), each licensed manufacturer shall maintain separate records of sales or other dispositions made of firearms to non-licensees.  Such records shall be maintained by the form and manner prescribed by 478.124 and 478.125, in regard to firearms transaction records and records of acquisition and disposition of firearms.

e.      Pursuant to 18 U.S.C. § 923(i) and 27 C.F.R. § 478.92, a licensed importer and licensed manufacturer shall identify by means of a serial number engraved or cast on the receiver or frame of each firearm imported or manufactured by such importer or manufacturer the name of manufacturer; city and state of manufacturer; model designation, caliber/gauge, and serial number.

## FACTS SUPPORTING PROBABLE CAUSE

7.      Since approximately June 2016, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and Homeland Security Investigations ("HSI"), have been investigating allegations of illegal arms trafficking from the United States to Australia.  To date, the investigation has focused on FFLs located in Wisconsin, Minnesota, and Massachusetts.

8.      According to Senior Detective Paul Jones, of the Victoria, Australia, Police Department, an Australian law enforcement official, in February 2016, a 9mm rifle was seized during the investigation of an armed robbery of a Cash-In-Transit vehicle.  According to an Australian law enforcement official, upon examining the 9mm rifle, it was determined that the rifle functioned as a fully-automatic machinegun.  The magazine release of the rifle contained certain

5

markings that caused Australian law enforcement to believe the rifle had been manufactured by Thureon Defense, LLC ("Thureon"), an FFL that operates in New Holstein, WI.

9.      Between June 27, 2016, and August 4, 2016, agents with ATF and HSI interviewed Andy Huebschmann, a FFL and the owner of Thureon, about firearm shipments to Australia.[2] Huebschmann initially stated that around April 2013, he sold five firearm kits to Australian citizen, Paul Munro, who resides in Dubbo, Australia.   According to Huebschmann the "rifle kits: consisted of a firearm with a 10.5 inch barrel and M16 trigger groups[3] designed to accept a Glock magazine.  Huebschmann stated that he also sold to Munro a machining plate, also known as a "jig," for drilling holes into the lower receiver of the firearm described above.  Huebschmann identified a photograph of the firearm seized in Australia as being comprised of the parts from one of the rifle kits sold to Munro with additional drill holes added to the lower receiver.

10.      Huebschmann said that drilling additional holes in the lower receiver of the firearm described above allowed an assembled rifle kit to be readily converted from semi-automatic firearm to a fully automatic firearm.  Huebschmann stated his company (Thureon) manufactured the firearm components that comprised the firearm kits and the jig intended to be used to drill the additional holes in the lower receiver.

---

2      Huebschmann initially denied any knowledge of the firearm seized in Australia.  On June 27, 2016, Huebschmann admitted he manufactured and shipped the firearms seized in Australia.  On or about July 8, 2016, Huebschmann began cooperating with ATF and HSI pursuant to a proffer agreement with the Office of the U.S. Attorney for the Eastern District of Wisconsin.  No promises have been made to Huebschmann in exchange for his cooperation in this investigation.

3      Based on my training and experience and information obtained from other experienced agents, and information from Huebschmann, I know these parts are common to military issued M16 rifles and are adaptable to Thureon carbines.  The trigger groups allow for both semi-automatic and fully automatic functionalities.

11.     Huebschmann voluntarily provided ninety-seven Model 1911, firearm frames ("1911 firearm frames")[4] and six rifle kits to ATF.  Huebschmann stated he obtained the 1911 firearm frames from Remsport Manufacturing ("Remsport").  Huebschmann stated he was not responsible for paying FFL Remsport for the 1911 firearm frames.  Australian Paul Munro handled the purchase and shipment arrangements for delivery of the 1911 firearm frames to Huebschmann.  Huebschmann stated he is aware that Munro has a personal relationship with the owner/managing official of FFL Remsport, Ron S. Chiasson.

12.     Huebschmann stated he had intended to ship the 1911 firearm frames and the rifle kits to Munro in Australia.  The 1911 firearm frames and rifle kits were to be secreted in the false bottom of a crate containing a motor vehicle engine.[5]  According to Huebschmann, Munro directed Huebschmann to send the crate, along with the ninety-seven 1911 firearm frames and six rifle kits, to a business in Montclair, California.  Huebschmann understood from Munro the crate would then be sent from California to Munro in Australia.  Huebschmann stated he had not applied for an export license for the ninety-seven 1911 firearm frames or six rifle kits.

13.     Huebschmann stated that he had first met Munro at the Las Vegas Shot Show in January 2013.  Sometime after meeting Huebschmann, Munro expressed an interest in purchasing

---

[4]     ATF's Firearms and Ammunition Technology Division ("FATD") provides expert technical support to ATF, other Federal agencies, State and local law enforcement, the firearms industry, Congress, and the general public.  FATD is responsible for technical determinations concerning types of firearms approved for importation into the United States and for rendering opinions regarding the classification of suspected illegal firearms and newly designed firearms.  FATD examined the 1911 firearm frames seized from Huebschmann and classified them as "firearms."  As described in this Affidavit, the 1911 firearm frames were manufactured by Remsport.

[5]     Huebschmann consented to the seizure of the shipping crate.  Agents examined the crate and determined it consisted of two wood pallets stacked on top of each other and four plywood sides.  The use of stacked pallets created a cavity between the bottom pallet and top pallet that was not visible once the sides of the crate were secured.

Thureon products.  In or around March 2013, Huebschmann agreed to supply Munro with six rifle kits, with the understanding that the rifle kits would be exported to Munro in Australia.

14.     According to Huebschmann, in or around April 2013, a month after agreeing to sell Munro the rifle kits, Munro visited Huebschmann at Thureon's office in Wisconsin.  Huebschmann stated that he was instructed by Munro to send the rifle kits to a "shipping and forwarding" company in St. Croix Falls, Wisconsin.  Huebschmann was also instructed to notify an individual named Ricky Stafford after shipping the rifle kits.  Huebschmann stated that he did not apply for an export license to export the six rifle kits to Munro in Australia.

15.     According to Huebschmann, in or around April 2014, Munro met with Huebschmann at Thureon's office in Wisconsin and provided Huebschmann with two unfinished AR-15 lower receivers.  According to Huebschmann, Munro asked Huebschmann if Huebschmann could machine the trigger/hammer area.  Munro also asked Huebschmann to fabricate a machining plate that Munro could use to complete the necessary drilling in the receivers that would enable the completed AR-15s to operate in a fully automatic capacity.  Huebschmann stated that he agreed to machine the two AR-15 receivers and four additional AR-15 lower receivers that Munro would deliver or cause to be delivered to Huebschmann on a later date.  Huebschmann also agreed to fabricate and supply Munro with the machining plate to enable the AR-15 lower receivers to be modified to allow them to operate as fully automatic firearms.  On August 4, 2016, Huebschmann provided law enforcement a copy of the Computer Aided Design drawing that was uploaded into Huebschmann's computer to manufacture the template for the machining plate.

16.     Huebschmann stated that he received the four AR-15 lower receivers sometime after September 15, 2014.  Huebschmann stated that the lower receivers were shipped to him from

8

a company called Remsport Manufacturing. According to Huebschmann, prior to receiving the AR-15 lower receivers from Remsport, he had not conducted any business with that company. Huebschmann also stated that he did deliver the six AR-15 lower receivers and the machining template to Munro, but he cannot recall the manner in which they were exported to Australia. Huebschmann was able to locate and provide agents with records relating to the purchase of six M16 trigger assemblies for those AR-15 lower receivers.

17.    According to Huebschmann, in or around December 2014, at Munro's request, Huebschmann agreed to "machine" 1911 firearm frames that would be supplied to him from an individual Munro identified as "Ron" from Remsport.[6] According to Huebschmann, on or about December 23, 2014, Ron Chiasson ("Chiasson") from Remsport contacted Huebschmann using email and asked Huebschmann to provide a copy of his FFL to Chiasson. Huebschmann stated that he sent a copy of his FFL to Chiasson using email. On or about December 24, 2014, Chiasson sent an email to Huebschmann that stated, "Thank you please tell Paul there on the way. Ron."[7]

18.    According to Huebschmann, in or around January 2015, he received thirty 1911 firearm frames from Remsport.[8] Huebschmann provided law enforcement with a packing slip, dated December 23, 2014, that indicated "30 non-gun, unfinished blank receiver blanks" had been shipped from Remsport Mfg. to "Paul Munroe, c/o Thureon Defense, 2118 Wisconsin Avenue,

---

[6]    According to Huebschmann, the term "machine" meant to mill and drill the unfinished 1911 firearm frame so they could accept certain components and be assembled into completed 1911 firearms.

[7]    Huebschmann voluntarily provided a copy of this email to the HSI and ATF.

[8]    According to Huebschmann, the thirty 1911 firearm frames that he received in the January 2015 shipment from Remsport were in the same stage of completion as a frame he surrendered to law enforcement in June 2016. FATD subsequently determined the June 2016 1911 firearm frame was a "firearm."

New Holstein, WI 53061" and a shipping label. Huebschmann stated that shortly after receiving the 1911 firearm frames he machined them to make them compatible with the remaining components of a 1911 firearm, to complete the firearm.

19.      According to information obtained from Huebschmann and Ricky Stafford, an associate of Munro, in February 2015, Munro and Stafford visited Huebschmann at Thureon's office in Wisconsin.[9]  Stafford and Munro arrived in a pickup truck together.  The wooden crate that contained parts for a motor vehicle engine were in the bed of the truck.  Huebschmann stated that once the engine parts were removed from the crate, a hidden compartment was revealed. According to Huebschmann, Munro brought approximately thirty Colt-style 1911 slides[10] that corresponded to the 1911 firearm frames Huebschmann received from Remsport.

20.      According to Huebschmann, the thirty Colt-style 1911 slides, were placed into the secret compartment of the crate for shipment to Australia.  Huebschmann, Stafford, and Munro were present when the Colt-style 1911 slides were placed in the secret compartment of the crate. Huebschmann stated that prior to shipping the crate, but after Munro and Stafford left Thureon, Huebschmann completed loading the crate by adding the thirty machined 1911 firearm frames and six rifle kits that were purchased by Munro, from Huebschmann.  Huebschmann stated that the

---

[9]      Huebschmann stated that Dale Nygaard (Federal Firearms Licensee # 341171087G00731 at 5996 5th Street SW, Howard Lake, MN) was the individual with Munro in February 2015.  Nygaard was later questioned about the February 2015 trip to Thureon, and he denied he was at Thureon with Munro.  Agents from ATF and HSI recently interviewed Ricky Stafford, who stated that he was with Munro at Thureon during the February 2015 trip.  Huebschmann has denied ever meeting Stafford.

[10]      The "slide" is a part on a semi-automatic pistol that moves during the operating cycle (i.e. firing a gun) that generally houses the firing pin and extractor, and serves as the bolt.

crate was sent to California in March 2015. Huebschmann stated that he did not apply for or obtain an export license for the shipment.[11]

21.   Huebschmann stated that Munro agreed to pay him approximately $2,000 to complete the machining process of the 1911 frames, and approximately $1,000 for each rifle kit, to ship them to California for export to Australia. Huebschmann stated that Munro paid him approximately half of the agreed upon $8,000. Huebschmann stated that sometime after he sent the crate to California, Munro informed Huebschmann that he (Munro) had arranged for Dale Nygaard to pay the balance of the $8,000 owed to Huebschmann. Huebschmann stated that on August 15, 2015, Nygaard met with Huebschmann at a gas station in Montello, Wisconsin, and delivered the balance of the $8,000 to Huebschmann. Huebschmann voluntarily provided copies of text messages that he exchanged with Nygaard to Federal agents.

22.   According to Huebschmann, in or around January 2016, at Munro's request, Huebschmann agreed to machine more 1911 firearm frames. Huebschmann stated that shortly after his conversation with Munro, Chiasson/Remsport shipped one hundred 1911 firearm frames to Huebschmann.[12] According to Huebschmann, he drilled holes and machined slide rails into those 1911 firearm frames. According to Huebschmann, Munro later contacted him and requested Huebschmann ship three of the machined 1911 firearm frames to a location in Montclair, CA. According to Huebschmann, of the one hundred 1911 firearm frames that he received from Remsport, one of the frames was damaged and Huebschmann could not machine that frame. In June, 2016, Huebschmann turned over a total of ninety-seven firearm frames to ATF. Those

---

[11]   According to HSI Special Agent Stachowski, he searched ACE for an export license associated with this shipment of rifle kits, but he was unable to locate an export license being filed in connection with this shipment.
[12]   The frames arrived in a box, with a shipping label from Remsport Mfg.

frames were sent to FATD for examination.  FATD determined that each of the ninety-seven 1911 firearm frames was a "firearm."  However, none of those 1911 firearm frames had an engraved/stamped serial number or other manufacturer markings as required by 18 U.S.C. § 923(i) and 27 C.F.R § 478.92.

## Recent Activity Involving Chiasson

23.     On August 9, 2016, at the direction of law enforcement, Huebschmann had a recorded phone conversation with Chiasson.  During the phone call, Huebschmann told Chiasson that he had damaged two of the 1911 firearm frames when he was loading them into the hidden compartment of the crate that was to be shipped to Munro.  Huebschmann asked Chiasson to send him two additional 1911 firearm frames, at the same price Munro paid per frame, for the next shipment.  In response, Chiasson agreed to supply two 1911 firearm frames and stated he believed he charged Munro approximately $98 per frame.  Chiasson then asked Huebschmann to text him the address to which Chiasson should ship the 1911 firearm frames.  Chiasson concluded the phone call by providing Huebschmann with the cellular telephone number (413) 531-3018.

24.     A short time later, at the direction of law enforcement, Huebschmann initiated a series of text message communications with Chiasson, who was using phone number (413) 531-3018.  Certain pertinent text messages exchanged between Huebschmann and Chiasson were as follows:

### August 9, 2016

a)  Huebschmann: "Hey Ron. Andy from Thureon. Thanks for helping me fix this before Paul finds out. We're expecting another crate delivered in the near future. Hopefully the hidden compartment will be big enough this time so that everything will fit. Thanks for shipping those 2 frames out today."

Chiasson: "I got it."

12

Huebschmann: "Let me know for sure what Paul's price was, and I'll square up with you."

Chiasson: "ok"

Huebschmann: "Hi Ron. Just in case you need it, my shipping and mailing address is- Sunny Hill Ent. W1015 Cty. HHH Chilton, WI. 53014"

Chiasson: "Got it, thank you."

**August 18, 2016**

   b) Huebschmann: "Hey Ron. Just following up from last night. Did those 1911 frames get shipped?" "Even if you ship them OverNite on my UPS account...."

Chiasson: "Ok will do, you can count on it."

Huebschmann: Do you need my acct number? Did you find the tracking number of the previous shipment, or wasn't it sent?"

Chiasson: "Get me your UPS number please."

Huebschmann: "548 3EB" "Sunny Hill Ent. W1015 Cty. HHH Chilton, WI 53014" "Please let me know that you got both the acct number and shipping address"

Chiasson: "Yes!"

**August 19, 2016**

   c) Huebschmann: "Hey Ron. I checked my UPS account. I didn't see where you sent me the 1911 frames... on my account. Did they get shipped?" "Oops! They just showed up!!!" "Thanks"

25.    On August 19, 2016, Huebschmann received the two 1911 firearm frames from Chiasson. The computer generated shipping label indicated that they were shipped from Remsport Manufacturing at 566 Holyoke Street, Ludlow, Massachusetts 01056. The 1911 firearm frames did not have the engraved/stamped serial number or other manufacturer markings as required by 18 U.S.C. § 923(i) and 27 C.F.R § 478.92.

26.    On August 31, 2016, law enforcement officers executed a federal search warrant at the business/residence of FFL Dale Nygaard in Howard Lake, MN. During an interview with investigators at the time the search warrant was executed, Nygaard stated that he had shipped

unmarked 1911 firearm frames to Munro in Australia. At Nygaard's residence, agents found a 1911 firearm frame that did not have an engraved/stamped serial number or other manufacturer markings as required by 18 U.S.C. § 923(i) and 27 C.F.R § 478.92.

27.     This frame, which an ATF Special Agent examined, had no manufacturer markings or serial number, and was determined to be nearly identical to the Model 1911 firearm frames manufactured by Remsport, which Huebschmann had turned over to ATF in June, 2016. Nygaard explained that the 1911 firearm frame had been sent to Nygaard by Remsport, with the understanding that Nygaard would ship it to Munro in Australia.

28.     According to FATD records, in 2011 Ron Chiasson sent a Model 1911 firearm frame to ATF and requested a determination as to whether it was a "firearm" under definition of the law. FATD responded to Chiasson in writing, that the firearm frame he had sent to ATF was a "firearm" by definition of law (Title 18, USC, Section 921(a)(3)). In the written response, ATF stated the following, "in order **not** to be recognized as a firearm, a 1911 style receiver-blank or receiver-casting must **not** have: a) slide rails or slide rail indexing marks; b) a barrel seat; and c) no more than **two** of any of the following four critical holes drilled – 1) slide-stop pivot, 2) sear-pivot, 3) disconnector, or 4) hammer-pivot pin."

29.     In September, 2016, ATF special agents sent a Model 1911 firearm frame seized from Huebschmann to FATD for determination. According to Huebschmann, the frame from Remsport had not been machined by Huebschmann because it was damaged prior to him receiving it. Huebschmann received the firearm frame from Remsport in December, 2015. Also sent to FATD were two firearm frames sent to Huebschmann by FFL Remsport in August, 2016. FATD determined that those frames were "firearms" and that they were required to have an

engraved/stamped serial number and other manufacturer markings as required by 18 U.S.C. § 923(i) and 27 C.F.R § 478.92 prior to Remsport shipping them from the Subject Premises.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

30.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the Subject Premises, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

31.     *Probable cause.*  I submit that if a computer or storage medium is found on the Subject Premises, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.     Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet.  Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.      Wholly apart from user-generated files, computer storage media—in particular, computer internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

32.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the Subject Premises because:

a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.   Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of

16

peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

      b.    As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some

information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

     c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

     d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

f.      I know that when an individual uses a computer to obtain unauthorized access to a victim computer over the Internet, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense. The computer is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

33.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage

media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

      a.      The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.  Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.  Storage media can store a large volume of information.  Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

      b.      Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      c.      Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

34.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## SEALING

35.    Because this is an ongoing grand jury investigation and premature disclosure of the investigation could endanger agents and officers executing the warrant, cause Chiasson or others to flee, and cause destruction of evidence, I request that this affidavit, the application for the search warrant, and the search warrant be sealed until further court order.  As described above, certain evidence relevant to this investigation is stored electronically and public disclosure of the search warrant materials at this time could result in the destruction of that electronically stored information.

## **CONCLUSION**

36.     Based on the above information, I respectfully submit that there is probable cause to believe that evidence, instrumentalities, and fruits, related to violations of the Subject Offense, as further described in Attachment B, will be found at the Subject Premises, as further described in Attachment A.


Anthony Ventetuolo
ATF Special Agent


Subscribed to and sworn to
before me on October 14, 2016.


Katherine A. Robertson
United States Magistrate Judge
District of Massachusetts

**ATTACHMENT A**

**LOCATION TO BE SEARCHED**

The **Subject Premises** is a commercial building located at 566 Holyoke St, Ludlow Massachusetts, 01056.   More specifically, the **Subject Premises** is identified as a large commercial structure made from gray corrugated metal and cinderblock.   The number "566" appears on a white metal door with a large glass window on the front of the business.   Below the window on the door appears the word "Office" in in black bold letters.   There is a large bay door on the left side of the building.   A sign reading "RCS DIESEL SERVICES INC" is located in near the driveway entrance on Holyoke Street.   The **Subject Premises** also includes several Conex-style shipping containers, and trailers contained within a fence surrounding the property.

# ATTACHMENT B
## ITEMS TO BE SEIZED

Evidence concerning violations of (a) Title 18, United States Code, Section 922(b)(5) (Failing to keep required records) (b) Title 18, United States Code, Section 922(m) (Federal Firearms Licensee omitting information from or falsifying records); (c) Title 18, United States Code, Section 922(e) (shipment in interstate or foreign commerce, to persons other than licensed importers, manufacturers, dealers, or collectors, any package in which there is any firearm without written notice to the carrier); (d) Title 18, United States Code, Section 923(i) (Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon); and (e) Title 18 United States Code, Section 924(a)(1)(A) (Knowingly making a false statement of information required to be kept in the licensee's records) (collectively referred to as the "Subject Offenses") including:

1.      FFL Acquisition and disposition records; ATF Form 4473, Firearms Transaction Records, which documents the sale of a firearm, to anyone other than a licensee, any and all records relating to any theft, loss or missing firearms of the FFL; any and all records of internal inventories conducted by the FFL, including, but not limited to the FFL's documents relating to background checks, dating from 2014 through the present;

2.      Documents and information relating to the manufacturing, brokering, acquisition, sale, and/or export of firearms or firearm components, including purchase orders, shipping records, bills of lading, airway bills, invoices, price quotations, price lists, shipping documents, business correspondence, and customer lists, dating from 2014 through the present;

3.      Shipping containers containing secret compartments;

4.      Photographs of Paul Munro, Ron Chiasson, Andy Huebschmann, Ricky Stafford,

or other co-conspirators of this investigation;

5.     Records of occupancy of the Subject Premises dating from 2014 through the present;

6.     Any communication between Chiasson and Munro, Nygaard, Huebschmann, or other co-conspirators concerning the Subject Offenses;

7.     Firearms; and barrels, cylinders, receivers (frames) or complete breech mechanisms for firearms located in secret compartments in shipping containers;

8.     Financial records: related to committing the Subject Offenses, reflecting acquisitions, dispositions, transactions, sales, and inventory or otherwise reflecting the flow of firearms in and out of Remsport Manufacturing, including sales receipts, credit card receipts, register tapes, accounts receivables, bank account statements, checks, deposit times, withdrawal items, insufficient-funds notices, cashier's checks, money orders, cancelled checks, safe deposit box records and safe deposit box keys, and invoices, dating from 2014 through the present;

9.     Firearm frames that do not have the required engraved/stamped serial number and other manufacturer markings as required by 18 U.S.C. § 923(i) and 27 C.F.R § 478.92

10.     Any and all records related to the importation, production and shipment of firearms, or firearms parts, or castings of firearm, or receiver blanks, including but not limited to commercial invoices, job travelers, packing slips, ATF Form 6 (Application and Permit for Importation of Firearms, Ammunition, and Implements of War) and ATF Form 6a (Release and Receipt of Imported Firearms, Ammunition and Implements of War), receivers and castings, dating from 2014 through the present;

11.     Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers of any persons who may be involved in the Subject Offenses;

12.     Travel records including airline ticket receipts, vehicle rental receipts, credit card receipts, hotel receipts, travel agency vouchers, long distance telephone call records and other items reflecting domestic and foreign travel;

13.     Routers, modems, and network equipment used to connect computers to the Internet.

14.     With respect to any computer equipment or other electronic devices (hereinafter "computer") used to facilitate or commit the Subject Offenses:

a.     evidence of who used, owned, or controlled the computer at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.     evidence of software that would allow others to control the computer, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.     evidence of the lack of such malicious software;

d.     evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

e.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

f.     evidence of the times the computer was used;

g.     passwords, encryption keys, and other access devices that may be necessary to access the computer;

h.     documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

i.     records of or information about Internet Protocol addresses used by the computer;

j.     records of or information about the computer's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

      k.     contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.